UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BOARD OF TRUSTEES OF THE PLUMBERS, PIPE-
FITTERS & MECHANICAL EQUIPMENT SERVICE,
LOCAL UNION NO. 392 PENSION FUND, *et al.*,

Case No. 1:13-cv-858

Judge Timothy S. Black

       Plaintiffs,

vs.

R. AND T. SCHNEIDER PLUMBING CO., *et al.*,

       Defendants.

**ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(Doc. 26); AND (2) DENYING DEFENDANT SCHNEIDER PLUMBING CO.'S
MOTION FOR SUMMARY JUDGMENT (Doc. 27)**

This civil action is before the Court on Plaintiffs' Motion for Summary Judgment

(Docs. 26, 29) and the parties' responsive memoranda (Docs. 30, 34), and Defendant

Schneider Plumbing Co.'s Motion for Summary Judgment (Doc. 27) and the parties'

responsive memoranda (Docs. 32, 35).

## I.      STATEMENT OF THE CASE

Plaintiffs include the trustees of four multi-employer pension and welfare fringe

benefit trust funds, the trustees of an industry promotion trust fund, and a Union.[1] The

---

[1] Plaintiffs include Board of Trustees of the Plumbers, Pipefitters & Mechanical Equipment
Service, Local Union No. 392 Pension Fund; Board of Trustees of the Plumbers, Pipefitters &
Mechanical Equipment Service, Local Union No. 392 Health and Welfare Fund; Board of
Trustees of the Plumbers, Pipefitters & Mechanical Equipment Service, Local Union No. 392
SUB Fund; Board of Trustees of the Plumbers, Pipefitters & Mechanical Equipment Service,
Local Union No. 392 Education Trust Fund; Board of Trustees of the Cincinnati Plumbing and
Pipe Fitting Industry Promotion Trust Fund; and Plumbers, Pipefitters & MES, Local Union No.
392 U.A. (the "Union") (collectively "Plaintiffs").

five trust funds were created by the terms of a collective bargaining agreement ("CBA") and trust agreements entered into between the Union and the Mechanical Contractors Association of Cincinnati, a multi-employer association that included Defendant R. and T. Schneider Plumbing Co. ("R&T").  The CBA requires employers to submit monthly reports of hours worked by covered employees, make contributions to the Pension, Health and Welfare, and SUB trust funds at fixed rates per employee-hour paid, make contributions to the Education and Industry Promotion trust funds at fixed rates per employee-hour worked, and deduct specified percentages from employees' wages for Union dues.  R&T, owned by Tom Schneider, complied with these requirements until it ceased operations in June 2013.  Contemporaneously, Defendant Schneider Plumbing Co. ("SP") began operations and considered itself a non-union company not bound by the CBA.  SP is owned by Janine, Todd, and Casey Schneider, former employees of R&T and the wife and sons of Tom Schneider, RT's owner.

Pursuant to section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, and sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132, 1145, Plaintiffs filed suit against R&T and SP, alleging that R&T has breached the CBA and that SP is bound by the CBA as the successor and alter ego of R&T.  Plaintiffs seek to compel submission of the monthly reports and recover unpaid contributions and wage deductions, along with liquidated damages, "for all months subsequent to June 2013."  (Doc. 1).

R&T did not respond to the complaint or otherwise defend in this action. Accordingly, the Court entered default judgment as to liability against R&T on June 11,

2014.  (Doc. 21).  SP timely answered, and the parties commenced discovery.

Subsequently, counsel entered an appearance on behalf of R&T and informed the Court at

a status conference that R&T had dissolved and that counsel's participation was limited

to facilitating discovery.  (Doc. 22).

## II.    UNDISPUTED FACTS

### A.    Plaintiffs' Undisputed Facts[2]

1.  The Board of Trustees of the Plumbers, Pipefitters & Mechanical Equipment Service,
    Local Union No. 392 Pension Fund; the Plumbers, Pipefitters & Mechanical
    Equipment Service, Local Union No. 392 Health & Welfare Fund; the Plumbers,
    Pipefitters & Mechanical Equipment Service, Local Union No. 392 SUB Fund; the
    Plumbers, Pipefitters & Mechanical Equipment Service, Local Union No. 392
    Education Trust Fund; and the Cincinnati Plumbing and Pipefitting Industry
    Promotion Trust Fund (collectively "Trust Funds") are authorized to administer the
    Trust Funds, which receive contributions from numerous employers pursuant to a
    Collective Bargaining Agreement ("CBA") between the employers and the Plumbers,
    Pipefitters & Mechanical Equipment Service, Local Union No. 392 ("Union").  (Doc.
    29, Ex. 2 at Art. VIII).

2.  Prior to its dissolution in July 2013, Defendant R. and T. Schneider Plumbing Co.
    ("R&T") was an employer engaged in an industry affecting commerce that agreed to
    be bound by the provisions of the CBA negotiated between the Union and the
    Mechanical Contractors Association of Cincinnati ("MCA").  (*Id.*, Ex. 3 at 14).

3.  Through the CBA, signatory employers also became bound by the provisions of the
    Agreements and Declarations of Trust, which created the Trust Funds, the Education
    Fund, and the Industry Fund (the "Trust Agreements").  (*Id.*, Ex. 2 at Art. VIII).[3]

4.  Pursuant to the provisions of the CBA and Trust Agreements, signatory employers
    were required to submit monthly reports of hours worked by its employees within the
    Trade and Territorial Jurisdiction of the Union.  (*Id.*)

5.  For each hour worked, signatory employers were required to pay contributions to the
    Trust Funds at the negotiated rates in the CBA for hours worked by its employees
    within the Trade and Territorial Jurisdiction of the Union.  (*Id.*)[4]

---

[2] *See* Doc. 29, Ex. 1 and Doc. 32, Ex. 1.

[3] The parties have not filed the Trust Agreements as part of the record.

6.  Pursuant to the provisions of the CBA, signatory employers were required to deduct 2.25% of paid wages for Union dues plus an additional 2.5% check-off for the Local No. 392 Equality and Stabilization Program (hereinafter referred to as "check-off deductions").  Check-off deductions are required to be received or postmarked on or before the 15th day (or the first legal banking day thereafter) of the calendar month following the calendar month during which the work was performed.  (*Id.* at Art. VII, § 4).[5]

7.  Pursuant to the provisions of the CBA, signatory employers were required to deduct 8% of paid wages for submission to the Union administered Vacation & Savings Plan.  (*Id.* at Art. VIII, § 6(a)).

8.  Contribution Reports, contributions, check-off deductions and Vacation & Savings Plan deductions were required to be received or postmarked by the bank on or before the 15th day (or the first legal banking day thereafter) of the calendar month following the calendar month during which the work was performed.  (*Id.* at Art. VIII, § 9).

9.  Pursuant to the CBA, and the Trust Agreements, signatory employers who failed to submit their monthly Contribution Reports and contributions to the Trust Funds on a timely basis were responsible for the payment of liquidated damages equal to 8% of the amount unpaid plus any reasonable attorney's fees and costs of enforcing the payment of any contributions to the Trust Funds.  (*Id.*)

10. Pursuant to the Evergreen Clause in the CBA, signatory employers agreed to be bound by successor CBAs, unless 60 days prior to the expiration date the Union or signatory employer gave notice of its intent to modify or terminate the CBA.  (*Id.* at Art. XVII, § 18).

11. In 1986, Tom Schneider ("Tom") and Robert Schneider began operating R&T.  (*Id.*, Ex 3 at 8).

12. R&T performed both repair and construction plumbing work for residential and commercial clients.  (*Id.* at 9-10).

13. Tom became the sole owner of R&T in 1993 or 1994.  (*Id.* at 11).

14. Around 1993-1994, Tom ran the day to day operations of R&T and was the sole plumber working in the field for the company.  (*Id.* at 15).

---

[4] Plaintiffs have not identified the applicable rates.

[5] Plaintiffs' proposed statement of fact that the CBA requires a 4% check-off deduction for the Equality and Stability Program is not supported by the cited portion of the CBA.

15. Janine Schneider ("Janine"), Tom's wife, worked as a secretary for R&T, and in the mid-to-late 1990s, began to take on more responsibility for financial matters, such as accounts receivable, accounts payable, payroll, and meeting with accountants.  (*Id.*, Ex. 4 at 13, 19-21).

16. From 1990 until June 2013, R&T operated out of Tom's and Janine's home at 7867 Foxtrot Drive, North Bend, Ohio 45052.  (*Id.*, Ex. 3 at 12, Ex. 4 at 6, 15-16).

17. Around 2009, R&T began leasing a garage on Harrison Street and Morgan Road (hereinafter referred to as the "Harrison Street Garage") to store vehicles, tools, and leftover material from other jobs.  (*Id.*, Ex. 3 at 24-27).

18. Tom and Janine have four sons: Todd Schneider ("Todd"), Casey Schneider ("Casey"), Tommy Schneider ("Tommy"), and Jake Schneider ("Jake").  (*Id.*, Ex. 4 at 8).

19. Todd began working for R&T as an apprentice in 1999.  Todd received his journeyman's card in 2004, after five years in the Local 392 Apprenticeship Program.  (*Id.*, Ex. 5 at 7-8, Ex. 7).

20. Casey began working for R&T as an apprentice in 2001 or 2002.  Casey received his journeyman's card five years afterward and began working for R&T as a journeyman plumber in 2006 or 2007.  (*Id.*, Ex. 6 at 8-9, Ex. 7).

21. Scott DeGolyer ("Scott") worked as a journeyman plumber for R&T for many years until its dissolution in June 2013.   (*Id.*, Ex. 4 at 40, Ex. 7).

22. Ryan Keller worked for R&T as a helper.  (*Id.*, Ex. 4 at 41; Doc. 35-5 at ¶ 2).

23. Jon Schneider, the cousin of Todd and Casey, also worked for R&T as a helper.  (Ex. 4 at 40-41, Ex. 5 at 18; Doc. 35-4 at ¶ 2).

24. R&T used the same telephone number until it ceased doing business on June 15, 2013.  (Doc. 29, Ex. 4 at 7).

25. Beginning in the mid-1990s, all of R&T's invoices identified the company name as "Schneider Plumbing."  (*Id.*, Ex. 3 at 18-19, Ex. 4 at 18, Ex. 8).

26. From the early 1990's until June 2013, R&T did business as "Schneider Plumbing."  (*Id.*, Ex. 3 at 17-19).

27. R&T's vans and Tom's business cards displayed the name "Schneider Plumbing."  (*Id.* at 19, 37).

28. R&T advertised in the Cincinnati Bell Yellow Pages as "Schneider Plumbing." (*Id.*, Ex. 20).

29. Since the mid-to-late 1990s, Janine was the sole individual in charge of R&T's financial operations. (*Id.*, Ex. 4 at 13, 18-19).

30. R&T maintained its only bank account with Cincinnati Federal Savings and Loan. (*Id.* at 20).

31. Janine was in charge of corresponding and submitting payments to the Yellowbook for advertising and was responsible for R&T maintaining liability insurance with Iori Insurance Company and workers compensation policy with Frank Gates. (*Id.* at 24-25, 30, 101).

32. Janine handled R&T's correspondence and payments with the individuals in the Fund Office at the Union for contributions and Contribution Reports. (*Id.* at 31-32).

33. Tom, Todd, Casey, and Scott worked in the field performing plumbing work and corresponding with the customers. Every morning, Todd, Casey, and Scott would go to the Harrison Street Garage to receive their assignments from Tom. (*Id.*, Ex. 6 at 18-19).

34. Todd mostly handled commercial plumbing assignments and Casey and Scott were more focused on the residential side of the business. (*Id.* at 22).

35. R&T's main customers were Carew Tower, Millennium Hotel, Covington Holiday Inn, Cincinnati Marriot, Covington Marriot, the Hilton, and Sky-Line Chili. (*Id.*, Ex. 3 at 39-40, Ex. 5 at 14-15).

36. R&T paid for Todd's cell phone, number while he worked at R&T. In certain circumstances, customers would contact Todd directly at this number. (*Id.*, Ex. 5 at 13-14).

37. Customers sometimes contacted Casey on his cell phone, which was paid for by R&T. (*Id.*, Ex. 6 at 13-14).

38. R&T's The phone numbers of R&T, Todd, and Casey's number were all provided by R&T through Cincinnati Bell. (*Id.*, Ex. 4 at 22, Ex. 6 at 13-14).

39. The two main suppliers of materials to R&T were Keidel Supply and Ferguson Supply and R&T had accounts on file with both suppliers. (*Id.*, Ex. 4 at 21-22).

40. Janine handled paying R&T's bills from suppliers. (*Id.* at 70-72).

41. R&T also owned and stored a number of tools in the Harrison Street Garage, including jaw sets, large/medium sewer machine, a jetter, an electric hammer, a curl press, and hand tools. (*Id.*, Ex. 3 at 26, 28, Ex. 9, Ex. 14 at ¶ 8).

42. R&T owned a 2005 Commercial Trailer and three vehicles: (1) 2007 Chevrolet Express; (2) 2008 Ford F350; and (3) 2002 Ford E350. (*Id.*, Ex. 10).

43. In December 2012, Tom was laid off from R&T. (*Id.*, Ex. 3 at 29).

45. Beginning in December 2012, Todd, Casey, and Scott would meet at the Harrison Street Garage every morning, and decide among themselves how to assign the work. (*Id.*, Ex. 5 at 17-18, Ex. 6 at 21-22).

46. Around April 2013, Todd and Casey began to discuss opening their own business. Todd and Casey met with Jim Higgins, Business Agent for the Union, to discuss their options with respect to the Union and whether they could open a new company and take a two year leave of absence from the Union. Higgins informed Todd and Casey that was not an option. Two days after meeting with Higgins, Todd and Casey met with Janine and the three decided to open their own non-union plumbing company. (*Id.*, Ex. 5 at 19-26, Ex. 6 at 30-33).

47. Todd learned that R&T was in bad financial condition. R&T ultimately ceased operations on June 15, 2013. (*Id.*, Ex. 4 at 70, Ex. 5 at 22-26).

48. On April 5, 2013, Defendant Schneider Plumbing Co. ("SP") was officially incorporated with the State of Ohio. (*Id.*, Ex. 11).

49. SP is owned by Todd, Casey, and Janine. Todd and Casey each own 24.5% and Janine owns 51% of SP. (*Id.*, Ex. 4 at 129-30).

50. SP is a commercial and residential plumbing service company. (*Id.*, Ex. 5 at 55-56).

51. SP has employed Todd, Casey, Janine, Scott, Jon Schneider, Jake Schneider, Ryan Keller, and Alissa Schneider. (*Id.*, Ex. 4 at 75, Ex. 5 at 56, Ex. 6 at 40-41).

52. With SP, Todd assigns out work for each morning, places phone calls to customers, visits potential customers to provide bids or estimates, and performs other work in the office. When necessary, Todd works in the field supervising jobs or performing plumbing work himself. (*Id.*, Ex. 5 at 36-38, Ex. 6 at 45, 57-58).

53. Casey continues to perform plumbing work for SP and makes the same hourly wage of $29.50 with SP that he made with R&T, but Casey has shifted from primarily working as a plumber on residential jobs with R&T to working remodels and as a foreman on commercial jobs with SP. (*Id.*, Ex. 6 at 44-45, 50, 54).

54. From June 2013 to approximately September 2013, Janine handled all accounts receivables, accounts payable, and general accounting functions for SP.  Alissa began performing all administrative functions for SP in approximately September 2013 and Janine ceased all involvement with administrative functions by November 1, 2013.  (*Id.*, Ex. 4 at 75-76, Ex. 5 at 34-36).

55. Scott Degolyer, a former journeyman plumber for R&T, has been a journeyman plumber for SP since June 2013.  (*Id.*, Ex. 5 at 56, Ex. 6 at 40, Ex. 12).

56. Jon Schneider, a former helper for R&T, began working and receiving payment for SP on June 8, 2013 as a helper and now works as an apprentice plumber.  (Ex. 4 at 78, Ex. 12; Doc. 35-4 at ¶¶ 2-5).

57. Ryan Keller, a former helper for R&T, began working and receiving payment for SP as a helper on June 8, 2013.  (Doc. 29, Ex. 4 at 78, Ex. 12; Doc. 35-5 at ¶¶ 2-4).

58. Alissa Schneider, Todd's wife, began working and receiving payment for SP on June 8, 2013 and began to assume full control over the accounts receivables, payroll and financial functions for SP from September 2013 to present.  Alissa is the only current employee at SP who didn't formerly work at R&T.  (Doc. 29, Ex. 4 at 76-77, Ex. 5 at 34-36, 56, Ex. 6 at 41, Ex. 7, Ex. 12).

59. At the time R&T ceased operation on June 15, 2013, R&T employed Todd, Casey, Janine, Scott, Ryan, and Jon.  Subsequently, all six began working for SP on June 16, 2013.  (*Id.*, Exs. 7, 12).

60. R&T made two separate transfers of $5,500.00 from its bank account to Defendant SP's bank account on June 6, 2013.  Janine testified that one of the transfers may have been an error that she later corrected.  (*Id.*, Ex. 4 at 81-84, 91-92, Ex. 13, Ex. 18).

61. R&T transferred the 2005 Commercial Trailer, 2007 Chevrolet Express, 2008 Ford F350, and 2002 Ford E350 to SP.  (*Id.*, Exs. 9, 10).

62. R&T transferred numerous tools including jaw sets, large and medium sewer machines, jetter, electric hammer, curl press, and hand tools to SP and has not received any payment for them.  (*Id.*, Ex. 3 at 28, Ex. 4 at 96, Ex. 14 at ¶ 8).

63. R&T transferred its phone number to SP and that number is now assigned to Alissa's cell phone.  (*Id.*, Ex. 4 at 72-73, 99).

64. SP currently maintains its bank account with Cincinnati Federal Savings and Loan.  (*Id.*, Ex. 13).

65. Todd still uses the same cell phone number for SP that he used while working for Defendant for R&T.  (*Id.*, Ex. 5 at 13).

66. Casey uses the same cell phone number for SP that he previously used while working for R&T.  (*Id.*, Ex. 6 at 6-7).

67. SP used R&T's invoices to some extent until December 2013.  These invoices included the name "Schneider Plumbing," listed Tom's name and license number, and provided the address as Tom and Janine's house, which was R&T's office.  (*Id.*, Ex. 3 at 35, Ex. 4 at 123-29, Ex. 6 at 43-44, Ex. 15).

68. In December 2013, SP began using new invoices for all of its jobs in December 2013.  These new invoices listed Todd's name and license number, and provided the address as the P.O. Box purchased by SP.  (*Id.*, Ex. 16).

69. Tom and Todd drafted an asset purchase agreement for the sale of the three vehicles and trailer from R&T to SP.  The asset purchase agreement listed the blue book value for the vehicles and trailer.  However, the agreement was not signed and no payment has been exchanged.  (*Id.*, Ex. 3 at 27-28, Ex. 4 at 95, Ex. 5 at 31, Ex. 9).

70. Employees of R&T and SP followed a similar daily routine.  Employees would report to the garage each morning to receive their daily assignments before going out into the field.  Prior to Tom's retirement in December 2012, Tom assigned all work to R&T employees.  Todd has assigned all work to SP employees since the company began operations.  Between December 2012 and June 2013, R&T's employees continued to report to the garage each morning, but the work was assigned the work among themselves.  (*Id.*, Ex. 3 at 15-16, Ex. 5 at 17-18, 36, Ex. 6 at 21-22, 36).

71. SP is currently using the tools that were previously owned and used by R&T.  (*Id.*, Ex. 4 at 97, Ex. 5 at 27, 31-32).

72. SP is currently using the Harrison Street Garage.  (*Id.*, Ex. 3 at 27, Ex. 6 at 35).

73. SP took "on all the hard assets . . . within the shop."  (*Id.*, Ex. 6 at 35).

74. SP performs work for sixty-seven (67) of R&T's former customers, including all of R&T's largest customers, which includes Carew Tower, the Marriot Hotel in Cincinnati and Covington, the Hilton, the Millennium Hotel, the Covington Holiday Inn and Skyline Chili.  (*Id.*, Ex. 4 at 103-22, Ex. 5 at 54, Ex. 17).

75. SP's two main suppliers are Keidel Supply and Ferguson Supply, the same two main suppliers previously used by R&T.  SP and R&T also both used Winn Nelson as a supplier, but SP and R&T each used a fourth supplier not used by the other company.  (*Id.*, Ex. 3 at 46-47, Ex. 4 at 21-22, Ex. 6 at 58).

76. Defendant SP uses Frank Gates for its worker's compensation policy.  (*Id.*, Ex. 4 at 100-01).

77. R&T's tax returns were prepared by Oliver Beringer and so were SP's 2013 tax returns.  (*Id.* at 130-31).

78. R&T did not communicate to most of its clients that R&T was closing, but Todd informed R&T's largest customers that he was starting his own plumbing company. (*Id.* at 7, Ex. 5 at 33-34).

79. Customers who called Tom for work shortly after R&T had ceased to perform work were told to call the main phone number used by SP, which was previously the number used by R&T.  (*Id.*, Ex. 3 at 43).

80. Tom did not tell Carew Tower that R&T was closing, instead he told them he was retiring.  (*Id.* at 39).

81. R&T's bank account was closed on March 4, 2014.  (*Id.*, Ex. 18).

82. In the two months after it ceased operations, R&T made several payments to suppliers, its uniform provider, and its advertiser.  (*Id.*, Ex. 9).

83. SP began performing work on June 16, 2013, but began paying some employees the week ending June 8, 2013.  (*Id.*, Ex. 4 at 77, Ex. 5 at 32, Ex. 12).

84. Pursuant to Appendix E of the CBA, plumbers classified as "Helpers" are considered covered employees under the CBA and part of a separate group of Plumbers and Pipe Fitters Local No. 392.  (*Id.*, Ex. 2 at App'x E).

85. Appendix E of the CBA requires that Helpers work under the immediate supervision of a journeyman plumber.  (*Id.*)

86. Plumbers for R&T would be assigned to a particular job and might bring a Helper with him to assist in the work.  (*Id.*, Ex. 6 at 24-25).

87. R&T did not permit Helpers to work without the supervision of a plumber.  (*Id.*, Ex. 3 at 36, Ex. 4 at 41, Ex. 6 at 24-25).

88. Jacob Schneider worked for SP as a Helper for a short period of time.  (*Id.*, Ex. 6 at 41).

### B.    SP's Undisputed Facts[6]

1. R&T Schneider Plumbing Co. ("R&T") was a small plumbing company formed in 1986.  (Doc. 29, Ex. 3 at 8).

2. At all times relevant to this lawsuit, Tom Schneider ("Tom") was the sole owner of R&T.  (*Id.* at 11.).

3. Tom managed R&T, and his wife, Janine Schneider ("Janine"), performed all financial and administrative functions of R&T.  (*Id.* at 15-16, Ex. 4 at 11-13).

5. With R&T, Janine would take calls from potential customers, and relay the information to Tom. Tom would then assign the work to specific employees.  (*Id.*, Ex. 3 at 15-16, Ex. 4 at 14, Ex. 6 at 19).

6. Tom was "the boss" of R&T and ran the company's day-to-day operations.  (*Id.*, Ex. 4 at 34, Ex. 6 at 22).

7. Tom and Janine's sons – Casey Schneider and Todd Schneider – worked for R&T as plumbers.  (*Id.*, Ex. 5 at 7-8, Ex. 6 at 10-11, 50.).

8. Todd and Casey never had any ownership interest in R&T, nor did they have an official management or supervisory role.  (*Id.*, Ex. 5 at 10, 11, 41, Ex. 6 at 10- 11).

9.  Scott Degolyer also worked for R&T as a plumber.  (*Id.*, Ex. 4 at 40).

10.  R&T also employed Jon Schneider and Ryan Keller as helpers.  (*Id.* at 40-41).

11.  In 1999, R&T became a signatory to a collective bargaining agreement with Local 392.  (*Id.*, Ex. 3 at 14).

13.  In approximately December 2012, R&T's business was very slow, and Tom decided to retire.  (*Id.* at 29-31, 37, Ex. 6 at 23).

14.  Tom consulted with the Union, who advised him that he needed to cease working for R&T for six months in order to close down the business.  (*Id.*, Ex. 3 at 29-31).

15.  Tom stopped working for R&T beginning in December 2012.  (*Id.*)

16.  During his absence, business continued to be slow and R&T had very little work.  (*Id.*, Ex. 6 at 23).

18.  R&T ceased all active operations by June 15, 2013.  (*Id.*, Ex. 3 at 29, 51, Ex. 4 at 70).

---

[6] *See* Doc. 28.

19. Around April 2013, knowing that Tom intended to retire and close R&T, Todd and Casey began to discuss their futures.  (*Id.*, Ex. 5 at 18-20, Ex. 6 at 26).

20. Todd and Casey decided to open their own plumbing company and began developing a business plan.  (*Id.*, Ex. 5 at 18-20, 25-26).

21. Todd and Casey initially spoke with a representative of the Union to discuss their options with respect to whether their new company would be a union shop or non-union shop.  (*Id.* at 23-25, Ex. 6 at 30-32).

22. Todd and Casey ultimately decided to operate their new company as a non-union shop.  (*Id.*, Ex. 5 at 23-25, Ex. 6 at 30-32).

23. Todd and Casey wrote separate letters to the Union dated June 14, 2013 that stated in full:

> Todd M. Schneider [Casey P. Schneider] would like to inform those necessary that it has been decided that as of June 15, 2013 R & T Schneider Plumbing Inc. will not be continuing as a contractor for PL PF Local392.
>
> Todd M. Schneider [Casey P. Schneider], personally, will also be leaving Local392. A final remittance report will be filed for June hours on July 15, 2013.

(Doc. 27, Exs. 5-1, 5-2).

24. Counsel for the Union responded in a letter that their termination of the collective bargaining agreement was "untimely under the terms of the agreement." (*Id.*, Ex. 5-3).

25. Schneider Plumbing Co. ("Schneider Plumbing") was incorporated in April 2013. (Doc. 29, Ex. 11).

26. Schneider Plumbing is owned by Todd, Casey, and Janine.  (*Id.*, Ex. 4 at 129-30).

27. Tom has never been an owner of Schneider Plumbing nor has Tom ever had any role in the company.  (*Id.*, Ex. 3 at 36, 48, Ex. 4 at 133, Ex. 5 at 57).

28. Schneider Plumbing began paying wages to certain employees for the week ending June 8, 2013 and began operations on June 16, 2013.  (*Id.*, Ex. 5 at 32, Ex. 12).

29. Schneider Plumbing employs the following individuals: (1) Todd Schneider, (2) Casey Schneider; (3) Scott Degolyer; (4) Ryan Keller; (5) Jon Schneider; (6) Alissa Schneider ("Alissa"); and (7) Jacob Schneider.  Schneider Plumbing

continues to compensate Janine even though she has not had a role in the company's day-to-day functions since November 2013.  (Doc. 27, Ex. 6 at ¶ 4; Doc. 29, Ex. 4 at 75, Ex. 5 at 57, Ex. 6 at 39).

30. Tom has no involvement in Schneider Plumbing.  (Doc. 29, Ex. 3 at 36, 48).

31. Alissa takes any incoming calls for Schneider Plumbing, and Todd assigns projects and prepares bids for new work.  (*Id.*, Ex. 5 at 33-36).

32. Casey assists with the management of the company and acts as a foreman on Schneider Plumbing's larger commercial projects.  (*Id.*, Ex. 6 at 45, 50).

33. Schneider Plumbing does more commercial and remodel work (as opposed to residential work) than R&T performed.  (*Id.* at 51-52).

34. While Janine assisted with some administrative functions during Schneider Plumbing's first few months of operations, she no longer is involved in the day-to-day operations of the company.  Instead, Alissa performs the administrative functions, including taking customer calls.  (*Id.*, Ex. 4 at 75, Ex. 5 at 33-35).

35. Alissa manages the administrative functions for Schneider Plumbing in a different manner than Janine had for R&T – including obtaining a payroll vendor to handle the company's payroll and utilizing QuickBooks to track the company's accounts receivables and other financial information (rather than performing those functions manually, as Janine had for R&T).  (*Id.*, Ex. 5 at 34-35, 56-67).

36. Tom and Todd expect that SP will pay R&T for the three vehicles and trailer SP obtained from R&T.  However, no payment has been exchanged.  (*Id.*, Ex. 3 at 27-28, 36, Ex. 5 at 30-31, Ex. 6 at 37-38, Ex. 9).

37. R&T's office was located at Tom and Janine's home.  Schneider Plumbing operated out of this same location from June to August 20, 2013.  On August 20, 2013, SP obtained a P.O. Box as its mailing address and moved its office to Todd's home.  (*Id.*, Ex. 3 at 11-12, Ex. 4 at 134-35, Ex. 6 at 41, Ex. 14 at ¶ 11).

38. None of the office equipment used by Schneider Plumbing at its new office was previously used in R&T's office.  (*Id.*, Ex. 6 at 42).

39. Schneider Plumbing obtained a new liability insurance policy (through a different insurance company than that used by R&T), a new tax identification number, and a new bank account.  (*Id.*, Ex. 4 at 100, 133).

40. Schneider Plumbing signed new contracts with the telephone and utility companies in June 2013.  SP used the same accountant from June to September 2013, but then switched to a new accountant.  However, SP's original accountant prepared its 2013 tax return.  (*Id.* at 131, 133-34, Ex. 5 at 57-58).

41. Schneider Plumbing utilizes the same shop space that R&T previously used, but Schneider Plumbing executed a new lease for the space.  (*Id.*, Ex. 5 at 60).

42. Schneider Plumbing has a different logo and different uniforms than those utilized by R&T.  (*Id.*, Ex. 3 at 19, 21, Ex. 6 at 53).

43. Schneider Plumbing has focused on growing its commercial and remodeling business, and Todd has worked to grow these aspects of the business.  (*Id.*, Ex. 5 at 39-40, Ex. 6 at 51).

44. R&T did not sell or provide its customer list to SP.  Sixty-seven of SP's 212 customers were previously customers of R&T.  (*Id.*, Ex. 3 at 33, Ex. 4 at 98, 103-22, Ex. 17).

45. R&T did not transfer its excel spreadsheets containing its financial records, computer equipment, or any files to SP.  (*Id.*, Ex. 4 at 98-99).

46. SP did not complete any projects that were begun by R&T, nor has Schneider Plumbing collected any payments owed to R&T for work R&T performed.

47. Schneider Plumbing has performed work 212 customers.  Sixty-seven of those customers were former customers of R&T, the remaining 145 were not.  (*Id.* at 103-122, Ex. 17).

48. Schneider Plumbing notified Plaintiffs in a letter dated  March 27, 2014 (more than 60 days prior to the expiration of the collective bargaining agreement on May 31, 2014) that SP did not believe it was bound by the collective bargaining agreement and that, even if it was, SP did not wish to renew the CBA.  (Doc. 27, Ex. 5-4; Doc. 29, Ex. 2 at Art. XVII).

### III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.

## IV.    ANALYSIS

Plaintiffs and SP filed cross motions for summary judgment.  Plaintiffs argue that SP is bound by the CBA and Trust Agreements signed by R&T under the theories of alter ego, successor liability, and single-employer liability.  Accordingly, Plaintiffs contend that SP has breached the CBA by failing to submit the required monthly reports, failing to pay contributions to the Trust Funds for its covered employees, and failing to deduct Union dues from its covered employees' wages.  Plaintiffs also seek to recover liquidated damages and attorney's fees under the CBA.  SP maintains that it is not bound by the CBA under any theory of successor liability and that R&T's obligations under the CBA terminated pursuant to the one-employee unit rule prior to the date SP began operations.

Courts "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."  *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015).  "When collective-bargaining agreements create

pension or welfare benefits plans, those plans are subject to rules established in ERISA."
*Id.*

Plaintiffs generally argue that SP is liable for the various unpaid contributions and wage deductions without addressing important distinctions between the nature of those discrete obligations and the entity seeking to enforce each specific obligation.

The Pension Fund, Health and Welfare Fund, SUB Fund, and Education Fund are multiemployer welfare and pension plans governed by ERISA.  29 U.S.C. § 1002(1), (2), (37).  Accordingly, the respective boards of trustees, the plans' administrators, seek to recover delinquent contributions pursuant to section 515 of ERISA.  *Id.* § 1145.[7]

In contrast, the Industry Promotion Fund exists "for the purposes of promoting the general welfare" of the plumbing industry and "shall not be construed as anything other than an Industry Promotion Fund for the benefit of the employer."  (Doc. 29, Ex. 2 at Art. VIII, § 5(a), (d)).[8]  Accordingly, the Industry Promotion Fund is not an employee welfare or pension plan governed by ERISA because it exists for the benefit of the employers, not

---

[7] "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."  29 U.S.C. § 1145.

[8] "An industry promotion fund is designed to benefit the industry as a whole and is primarily concerned with the relationship between the industry and the public rather than the relationship between the employed and the employer."  *Joint Admin. Comm. of Plumbing & Pipefitting Indus. in Detroit Area v. Washington Grp. Int'l, Inc.*, 568 F.3d 626, 628 (6th Cir. 2009) (internal citations omitted).

the employees. 29 U.S.C. § 1002.[9]

These five Trust Funds were created by the CBA and Trust Agreements, contracts entered into between the Union and the Mechanical Contractors Association of Cincinnati, and seek to recover delinquent contributions allegedly due from SP pursuant to the terms of those documents. An employer bound by the CBA must make contributions to the Trust Funds based on the number of hours that covered employees either work and or receive pay for.

Pursuant to section 301 of the LMRA, the Union asserts that R&T and SP breached the CBA by failing to make deductions from its covered employees' wages for Union dues, the Equality and Stability Plan, and the Vacation & Savings Plan. 29 U.S.C. § 185. The CBA requires employees to deduct 2.25% of paid wages for union dues "in accordance with an individual and voluntary written authorization." (Doc. 29, Ex. 2 at Art. VII, § 4(a)).[10] Together, Plaintiffs seek to hold SP liable for delinquent contributions and wage deductions "for all months subsequent to June 2013." (Doc. 1).

The identity of each Plaintiff and the nature of the obligation it seeks to enforce is important because "it is well-established that ERISA funds are accorded a special status and are entitled to enforce the written contracts, without regard to the understandings or common-law contract defenses of the original parties, similar to a holder in due course in

---

[9] Plaintiffs implicitly acknowledged this distinction in their complaint (Doc. 1 at ¶ 5), but they do not address it in their briefing on the motions for summary judgment. The Industry Fund's full name, the Cincinnati Plumbing and Pipe Fitting Industry Promotion Trust Fund, is noticeably different than the other four funds, all of which include the full name of the Union.

[10] No written authorizations appear in the record.

commercial law." *Operating Eng's Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1053 (6th Cir. 2015). An ERISA "pension or welfare trust is understood to be a third-party beneficiary of a CBA that receives contributions and issues payments negotiated by others." *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 460 (6th Cir. 1989). Due to their third-party beneficiary status, "multi-employer trust funds are entitled to rely on an employer's promises to make contributions to the funds, irrespective of any breach or omission by the union . . . because the funds often are not in a position to know what is going on between the employer and the union, and the union may have interests that differ from or are inimical to the funds' interests." *G & W Const. Co.*, 783 F.3d at 1053 (internal citations omitted).

Section 515 of ERISA "restricts the defenses employers may raise to suits brought to collect delinquent contributions to ERISA funds." *G & W Const. Co.*, 783 F.3d at 1052. The only recognized affirmative defenses are "fraud in the execution of the contract, illegality of contributions, decertification of the union, or termination of the contract." *Id.* at 1053. An employer's "claim that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit—although it might be a ground on which to obtain damages from the local union." *Behnke*, 883 F.2d at 460 (quoting *Robbins v. Lynch*, 836 F.2d 330, 334 (7th Cir. 1988)). Accordingly, "[a]ny conduct of the Union that is contrary to the written provisions of the agreements cannot affect the Funds' right to collect contributions that are due and owing to the Funds." *G & W Const. Co.*, 783 F.3d at 1053. The Industry Promotion Fund and the Union are not afforded this special status.

## A.    One-Employee Unit Rule

SP argues that it cannot be bound by the CBA pursuant to the one-unit employee rule. Plaintiffs maintain that R&T and SP both employed more than one employee in the bargaining unit at all relevant times and that, even if there were a one-employee unit, it was not maintained for a sufficient length of time for purposes of the rule.

The parties rely extensively on *Baker Concrete Const. Inc. v. Reinforced Concrete Iron Workers Local Union 372 of Int'l Ass'n of Bridge Structural, Ornamental, & Reinforcing Iron Workers*, No. 1:13-cv-225, 2014 WL 4961488 (S.D. Ohio Oct. 2, 2014), *appeal filed*, No. 14-4102 (6th Cir. argued June 10, 215). As described in *Baker Concrete*, "[w]hen an employer has no intention to employ anyone in the bargaining unit, the one employee unit rule permits employers to repudiate a collective bargaining agreement after only a few months of maintaining a one-or zero-employee unit." *Id.* at 4. SP maintains that R&T's obligations under the CBA terminated in early June 2013 pursuant to the one-employee unit rule. Accordingly, SP argues, there was no existing obligation that could bind SP under any theory of successor liability.

The Court finds that the one-employee unit rule as set forth in *Baker Concrete*, assuming that decision correctly stated the rule and is upheld on appeal, is nevertheless not applicable here for several reasons.

First, the employer in *Baker Concrete* and in all the cases cited therein were construction companies that signed CBAs pursuant to the pre-hire provisions of section

8(f) of the Nation Labor Relations Act.  29 U.S.C. § 158(f).[11]  "Section 8(f) explicitly

permits employers in the construction industry—but no other employers—to enter into

prehire agreements.  Prehire agreements are collective-bargaining agreements providing

for union recognition, compulsory union dues or equivalents, and mandatory use of union

hiring halls, prior to the hiring of any employees."  *Bldg. & Const. Trades Council of*

*Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*,

507 U.S. 218, 230 (1993).[12]  The Ninth Circuit in *Westlake*, a case relied upon heavily in

*Baker Concrete*, confirms that the existence of a section 8(f) pre-hire agreement is a

prerequisite to the application of the one-employee unit rule:

> We hold that *Mesa Verde* [*Constr. Co. v. Northern Cal. Dist. Council of
> Laborers*, 861 F.2d 1124 (9th Cir.1988) (en banc)], which did not involve a
> one-employee unit, did not affect our prior holding in *Operating Eng'rs
> Pension Trust v. Beck Eng'g & Surveying Co.*, 746 F.2d 557 (9th Cir. 1984),
> which did involve a one-employee unit.  There we held that "a construction
> industry employer who employs a single employee pursuant to a Section
> 8(f) pre-hire agreement is entitled to repudiate the agreement by conduct
> sufficient to put the union and the employee on notice that the agreement

---

[11] *J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, Local Union 1*, 398 F.3d 967, 974 (7th Cir. 2005); *Laborers Health & Welfare Trust Fund for N. California v. Westlake Dev.*, 53 F.3d 979 (9th Cir. 1995); *Stanker & Galetto, Inc. v. New Jersey Reg'l Council of Carpenters of United Bhd. of Carpenters & Joiners of Am.*, Civ. No. 12-5447, 2013 WL 4596947 (D.N.J. Aug. 28, 2013); *Whiting-Turner Contracting Co. v. Local Union No. 7*, 15 F. Supp. 2d 162 (D. Mass. 1998); *Haas Garage Door Co.*, 308 NLRB 1186 (1992); *Searls Refrigeration Co.*, 297 NLRB 133 (1989).

[12] "Section 8(f) allows unions and employers in the construction industry to enter into CBAs without requiring the union to establish that it has the support of a majority of the employees in the unit covered by the CBA.  Along with creating an exception to section 9(a)'s rule that unions must demonstrate a showing of majority support, section 8(f) also is an exception to the NLRA's requirement that the employer is bound to bargain with the exclusive representative even after the contract has expired."  *DiPonio Const. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 687 F.3d 744, 749 (6th Cir. 2012) (internal citation and quotation marks omitted).

has been terminated."  Our decision in *Beck* was "<u>specifically shaped to</u>
<u>respond to the unique circumstances of a single-employee bargaining unit</u>
<u>in the construction industry</u>."

*Westlake Dev.*, 53 F.3d at 982 (emphasis supplied).

Here, SP does not contend that the CBA is a pre-hire agreement.  Another district

court in this circuit has also recognized this same distinction and declined to apply the

one-employee unit rule.  *Payne v. Local Lodge 698*, 856 F. Supp. 2d 915, 923 (E.D. Mich.

2012) ("Plaintiff relies on cases involving 29 U.S.C. § 158(f), which pertains to pre-hire

agreements in the construction industry, but these cases only stand for the proposition that

the employer is permitted to terminate such an agreement with a single-employee

bargaining unit." (citing *J.W. Peters*, 398 F.3d 967; *Westlake*, 53 F.3d 979)).

Second, the one-unit employee rule likely does not affect the enforceability of the

CBA for purposes of ERISA.  The Seventh Circuit in *J.W. Peters*, another case that

involved a pre-hire agreement and was cited extensively in *Baker Concrete*, applied the

one-unit employee rule only after distinguishing an earlier decision from that circuit that

declined to apply the rule in the ERISA context.  *J.W. Peters*, 398 F.3d at 977 (noting that

the earlier decision "rested on the statutory language and unique considerations present in

the ERISA context, concerns that are not at issue here").  In that earlier decision, the

Seventh Circuit held that "the Board's finding that the one-man rule barred a remedy

under the NLRA did not resolve the issue of a potential remedy under ERISA.  Defenses

to the validity of a labor contract and liability under ERISA's section 515 present distinct

issues."  *Martin v. Garman Const. Co.*, 945 F.2d 1000, 1004 (7th Cir. 1991).  Further,

"[t]he one-man rule may remain valid for purposes of unfair labor practice proceedings while counting for naught when the contract is cognizable under ERISA." *Id.* at 1005.

In the ERISA context, this circuit "has permitted limited examination of a contract termination defense, at least if the parties' conduct shows, based on a cursory review, that the contract has been terminated." *G & W Constr.*, 783 F.3d at 1052. However, this limited examination is "superficial" and "sensibly balances the competing interests in avoiding complex litigation that starves a fund's necessary contributions and ensuring that the employer has a legitimate contractual obligation to make employee contributions." *Id.* (quoting *Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund v. A & H Mech. Contractors, Inc.*, 100 F. App'x 396, 403 (6th Cir. 2004)). Courts may engage in "a classically straightforward inquiry into whether the contract still existed," *id.*, which includes a situation where "an employer sends a timely, unambiguously phrased conditional notice of termination, and where the condition triggering the termination is undisputedly satisfied before a new CBA goes into effect." *Laborers Pension Trust Fund-Detroit & Vicinity v. Interior Exterior Specialists Constr. Grp., Inc.*, 394 F. App'x 285, 292 (6th Cir. 2010). However, the latter decision cautioned that the termination defense is limited to cases "where the relevant facts are not reasonably in dispute" because that "creates little or no more expense or complexity" than the other three cognizable defenses in ERISA section 515 cases. *Id.*[13]

---

[13] *See also La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 409 (5th Cir. 1998) ("[I]f the issue of termination cannot be resolved through cursory review, the defense to a section 515 action will not succeed.").

Here, the Court would have to engage in much more than a "limited examination" or "cursory review" to conclude that the CBA was terminated pursuant to the one-employee unit rule. *G & W Constr.*, 783 F.3d at 1052. For example, the parties dispute the threshold issue of whether R&T or SP employed more than one employee in the bargaining unit. Plaintiffs contend there were five employees in R&T's bargaining unit at the time it ceased operations, whereas SP maintains that Scott was the only employee. This disagreement implicates factual disputes and legal issues such as whether Ryan and Jon were helpers who performed the type of work covered by Appendix E to the CBA,[14]

---

[14] In arguing that the one-employee unit rule applies, SP conspicuously made no mention of Ryan or Jon in its motion for summary judgment or memorandum in opposition. (Docs. 27, 30). Only in its reply brief did SP argue that Ryan and Jon, employees SP repeatedly referred to as helpers, were not helpers as defined in Appendix E. (Doc. 35). Additionally, attached to SP's reply brief are affidavits of Todd, Casey, Ryan, and Jon that state that Ryan and Jon did not perform any work covered by Appendix E. (*Id.*, Exs. 2, 3, 4, 5). The affidavits state, in substantially identical terms:

> As Helpers, Ryan and Jon did not perform any plumbing-related tasks as described in Appendix E. Their duties were limited to tasks such as cleaning the shop, retrieving parts or tools, and loading/unloading equipment. Their jobs did not require any specialized knowledge, skills, or experience.

(Doc. 35, Ex. 2 at ¶ 7).

The Court questions whether these affidavits represent legitimate efforts to supplement the summary judgment record or are an attempt to create a sham fact issue. *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908-09 (6th Cir. 2006). Although the affidavits do not directly contradict deposition testimony, SP attempts to use the affidavits for more than simply revealing information that was not fully explored during those depositions. Tom, Janine, and Casey testified that helpers did not go to jobs on their own and were always assigned with a plumber. (Doc. 29, Ex. 3 at 36, Ex. 4 at 41, Ex. 6 at 24-25). Todd and Casey both testified that SP bills its customers $50 per hour for a helper. (*Id.*, Ex. 5 at 59, Ex. 6 at 24). Casey also testified that an invoice dated July 17, 2013 reflected work done by Jon as an apprentice and Ryan as a helper. (*Id.*, Ex. 6 at 39). However, the Court need not definitely decide whether the affidavits attempt to create a sham fact issue because the one-employee unit rule does not apply even if Ryan and Jon did not perform the type of work covered by Appendix E.

whether Ryan and Jon are excluded from the bargaining unit by way of the Union's

failure to enforce the union security clause and require them to become union members,[15]

and whether Todd and Casey were excluded from the bargaining unit because neither was

an "employee" as defined in section 2(3) of the NLRA, 29 U.S.C. § 152(3).[16]  Resolving

---

[15] SP appears to conflate union membership with inclusion in a bargaining unit.  The CBA contains a union security clause that tracks the language of section 8(a)(3) of the NLRA.  (Doc. 29, Ex. 2 at Art IV, § 1).  The congressional authorization for union security clauses in section 8(a)(3) "permits an employer and an exclusive bargaining representative to enter into an agreement requiring all employees in the bargaining unit to pay periodic union dues and initiation fees as a condition of continued employment, whether or not the employees otherwise wish to become union members."  *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 738 (1988).  Here, the CBA requires signatory employers to "utilize employees who, as a condition of employment, shall be required to maintain membership in the Union."  (Doc. 29, Ex. 2 at Art IV, § 1).  Further, if "an employee fails to tender to the Union the periodical dues and initiation fees uniformly required as a condition of acquiring or retaining membership, the employer will dismiss such employee upon the Union's request."  (*Id.*)

Section 8(a)(3) was enacted to address "unions' concerns about 'free riders,' *i.e.*, employees who receive the benefits of union representation but are unwilling to contribute their fair share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason."  *Id.* at 749 (quoting *Radio Officers v. NLRB*, 347 U.S. 17, 41 (1954)).  In other words, an employee's inclusion in a bargaining unit is entirely distinct from union membership.  SP fails to show why the Union's failure to enforce the union security clause, which in essence permitted Ryan and Jon to be "free riders," results in their exclusion from the bargaining unit.

[16] The Court questions whether it has jurisdiction to make such a determination.  SP argues that Todd and Casey were not in the bargaining unit because they were owners, managers, and supervisors of SP and the sons of Janine.  Section 2(3) of the NLRA provides that the term "employee" excludes "any individual employed by his parent or spouse" as well as "any individual employed as a supervisor."  29 U.S.C. § 152(3).  "Such a person is completely outside the scope of the statute and may not invoke its protection."  *NLRB v. Action Auto., Inc.*, 469 U.S. 490, 497 (1985).  "In the context of corporations, the Board has limited the § 2(3) exclusion to the children or spouses of an individual with at least a 50% ownership interest."  *Id.* at 497 n.7 (citing *Cerni Motor Sales, Inc.*, 201 N.L.R.B. 918 (1973)).  Here, it is undisputed that Tom had a 100% ownership interest in R&T and Janine had a 51% interest in SP.

In arguing that Todd and Casey were in the bargaining unit, Plaintiffs conflate the exclusion of an individual employed by his parent from section 2(3)'s definition of "employee" with the NLRB's exercise of its congressionally delegated authority to define the appropriate bargaining unit under section 9(b) of the NLRA.  *See Action Auto.*, 469 U.S. at 497-98 & n.7

those issues would require the Court to go far beyond the "limited examination"

envisioned in the case law, and potentially invade the exclusive jurisdiction of the NLRB

to make bargaining unit determinations or resolve representational issues.

Third, even if the Court accepts SP's contention that R&T and SP had one

employee in their respective bargaining units, neither maintained that one-employee unit

for the necessary length of time before attempting to repudiate the CBA. *Baker Concrete*

observed that "[w]hen an employer has no intention to employ anyone in the bargaining

unit, the one employee unit rule permits employers to repudiate a collective bargaining

agreement after only a few months of maintaining a one-or zero-employee unit." *Baker*

*Concrete*, 2014 WL 4961488, at *4. Here, SP argues that Todd and Casey were excluded

from R&T's bargaining unit starting in June 2013 when they became managers and

supervisors of SP. Even when accepting the contention that Scott was the only employee

in the bargaining unit in June 2013, the attempted repudiation also occurred in the same

month. Specifically, SP maintains that the letters Todd and Casey sent to the Union dated

---

(recognizing the distinction). In exercising its exclusive authority in to select an appropriate
bargaining unit, the NLRB "considers a variety of factors in deciding whether an employee's
familial ties are sufficient to align his interests with management and thus warrant his exclusion
from a bargaining unit." *Id.* at 495.

Plaintiffs' reliance on *NLRB v. Hubbard Co.*, 702 F.2d 634 (6th Cir. 1983) is unavailing
for several reasons. (Doc. 32 at 6-7). First, *Hubbard* involved judicial review of the NLRB's
decision to exclude an employee from a bargaining unit because that employee "enjoyed a
'special status' at the workplace which allied his interests with those of management." *Hubbard*,
702 F.2d at 636. SP argues that Todd and Casey fall outside the statutory definition of
"employee." Second, the Supreme Court in *Action Auto.* expressly abrogated the rule announced
in *Hubbard* and upheld the NLRB's "policy of excluding close relatives of management without
a showing of special job-related benefits." *Action Auto.*, 469 U.S. at 493-94. Finally, the cited
cases make clear that the NLRB has exclusive jurisdiction to make bargaining unit
determinations subject to judicial review in the court of appeals. *Kindred Nursing Ctrs. E., LLC
v. NLRB*, 727 F.3d 552, 558-59 (6th Cir. 2013).

June 14, 2013 provided the notice of R&T's intent to terminate or repudiate the CBA. (Doc. 27, Exs. 5-1, 5-2). The rule as set forth in *Baker Concrete* permits employers to repudiate a CBA "after only a few months." *Baker Concrete*, 2014 WL 4961488, at *4 (noting that the employer had not employed a bargaining unit member for almost ten years before repudiating the CBA). Accordingly, the one-employee unit rule cannot apply here.

Finally, neither R&T nor SP provided the requisite notice of repudiation that the one-employee unit rule requires. *Baker Concrete* stated that "repudiation under the one employee unit rule [is] effective 'by conduct sufficient to put the union and the employee [in the single-employee bargaining unit] on notice that the agreement has been terminated.'" *Baker Concrete*, 2014 WL 4961488, at *9 (quoting *Operating Eng'rs Pension Trust v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 566 (9th Cir. 1984)) (second alteration in *Baker Concrete*).[17] Even when accepting SP's contention that Scott was the only employee in the bargaining unit, SP does not argue or cite any evidence to suggest that Scott received proper notice that the CBA was terminated. *See Elec. Workers Local 58 Pension Trust Fund v. Gary's Elec. Serv. Co.*, 227 F.3d 646, 657 (6th Cir. 2000) ("The repudiation by conduct doctrine typically requires something more than mere breach of the 8(f) contract, in that the employees and the parties must be put on notice that the

---

[17] The complete quoted sentence from *Beck* reads: "We hold that a construction industry employer who employs a single employee pursuant to a Section 8(f) pre-hire agreement is entitled to repudiate the agreement by conduct sufficient to put the union and the employee on notice that the agreement has been terminated." *Beck*, 746 F.2d at 566. The express reference to a section 8(f) pre-hire agreement reinforces the Court's conclusion that the one-employee unit rule has no application here.

contract was void.").  Here, even if the one-employee unit rule could apply, the undisputed facts demonstrate that any attempted repudiation would be ineffective.

Accordingly, for these several reasons, the Court concludes that the one-employee unit rule is not applicable here.

**B.      Single Employer and Successor Liability**

Plaintiffs seek to hold SP liable for breaching the CBA under the single employer doctrine, successor liability, and the alter ego doctrine.  These theories and doctrines are closely related and employ similar analyses, but only the alter ego doctrine is applicable to the facts presented here.

The single-employer doctrine applies when "two entities concurrently perform the same function and one entity recognizes the union and the other does not."  *Trustees of the Detroit Carpenters Fringe Benefit Funds v. Andrus Acoustical, Inc.*, No. 11-CV-14656, 2014 WL 1746399, at *9 (E.D. Mich. Apr. 30, 2014).  This is often referred to as a "double-breasted operation," which exists where "two or more coexisting employers performing the same work are in fact one business, separated only in form."  *Trustees of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 318 (6th Cir. 2009).  Plaintiffs argue that R&T and SP constituted a single employer between June 1, 2013 and June 15, 2013.  However, the undisputed facts demonstrate that R&T and SP did not concurrently operate.  Rather, SP began operations the day after R&T closed down.  (Doc. 29, Ex. 5 at 32, Ex. 6 at 33-34).  Accordingly, the Court finds that single-employer doctrine is not applicable here.  *See Distillery, Wine & Allied Workers*

*Int'l Union v. Nat'l Distillers & Chem. Corp.*, 894 F.2d 850, 851 (6th Cir. 1990) (holding that two simultaneously operating companies were a single employer).

Successor liability is similarly not the appropriate framework for the required analysis. The theory of successor liability advanced by Plaintiffs provides that "a purchaser of assets may be liable for delinquent ERISA fund contributions . . . when two elements are established: (1) notice by the buyer of the seller's liability; and (2) sufficient evidence of continuity of operations between the buyer and seller." *Sheet Metal v. Total Air Sys., LLC*, 2014 U.S. Dist. LEXIS 82971, at *22 (N.D. Ohio June 18, 2014) (citing *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 99 (3rd Cir. 2011)). As the Third Circuit noted, "[t]he requirement of notice and the ability of the successor to shield itself during negotiations temper concerns that imposing successor liability might discourage corporate transactions." *Einhorn*, 632 F.3d at 96. The requirement of notice before imposing successor liability presupposes that the predecessor entity incurred the debt or liability prior to the asset sale. *See Sheet Metal*, 2014 U.S. Dist. LEXIS 82971, at *25 (observing that the theory "requires that a successor be put on notice before the assumption of debt follows").

Here, Plaintiffs do not seek to recover from SP for a liability incurred by R&T. Rather, Plaintiffs allege that SP is bound by the CBA and is liable for "unpaid contributions, check-off and wage deductions owed for all months subsequent to June 2013." (Doc. 1). The CBA and Trust Agreements require employers to pay contributions based on the number of hours worked by its covered employees and make deductions from the wages paid to those covered employees. (Doc. 29, Ex. 2 at Arts. VII, VIII). It is

undisputed that no employees worked for or were paid by R&T after June 15, 2013.  (*Id.*, Ex. 7).  Further, Plaintiffs do not allege that R&T owed any outstanding delinquent contributions or deductions prior to ceasing operations.  Accordingly, the Court will proceed to the alter ego analysis to determine if SP was bound by the CBA upon commencing operations.

### C.    Alter Ego

The alter ego doctrine was developed to "prevent employers from evading obligations under the National Labor Relations Act merely by changing or altering their corporate form."  *Trustees of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 317-18 (6th Cir. 2009).  "The alter ego doctrine is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is merely a disguised continuance of the old employer."  *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990).

The test for determining whether two companies are alter egos is "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership."  *Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012) (quoting *Fullerton Transfer*, 910 F.2d at 336).  "Evidence, or lack thereof, of an employer's intent to evade the obligations of a collective bargaining contract is merely one of the factors to be considered and is not a prerequisite to the imposition of alter-ego status."  *Id.*  "The analysis is flexible and no one element should become a prerequisite to

imposition of alter-ego status; rather, all the relevant factors must be considered together." *Id.*  Notably, this analysis is a "more relaxed, less exacting application of the alter-ego doctrine applied in order to effectuate federal labor policies." *Id.*  These factors assist the Court in answering the ultimate question:  "whether there was a *bona fide* discontinuance and a true change of ownership or merely a disguised continuance of the old employer." *Allcoast Transfer*, 780 F.2d at 581 (quoting *Southport Petro. Co. v. NLRB*, 315 U.S. 100, 106 (1942)).

The undisputed facts here lend themselves to a comparison with the facts presented in *Dorn Sprinkler*, 669 F.3d 790, which also involved family-owned businesses:

> Dorn Sprinkler was formed in May 1977 and its day-to-day operations were handled by its owner, David Dorn. . . . [I]n March 2007, Dorn Sprinkler went out of business with its required payments to the benefit funds languishing in arrears. . . .  Meanwhile, David Dorn's son, Christopher Dorn, who was lead salesman at Dorn Sprinkler, formed a company called Dorn Fire Protection, Inc. during the 1990s but had not started doing business.  In October 2006, shortly before financial troubles surfaced in his father's business, Christopher changed the name of Dorn Fire Protection, Inc. to Dorn Fire Protection, LLC, and began operations.

*Id.* at 792.  The court examined each of the alter ego factors in turn and found that they did not support alter-ego status.  Here, the undisputed facts weigh so heavily in the other direction that summary judgment for Plaintiffs is appropriate.

As in *Dorn Sprinkler*, Plaintiffs concede that the two entities do not share common ownership.  However, R&T and SP do "have the same business purpose and operate in the same marketplace."  *Dorn Sprinkler*, 669 F.3d at 794.[18]

The first factor is whether the companies have substantially identical management. In *Dorn Sprinkler*, the court found as follows:

> [E]ven though the characters are the same and are related to one another, this does not necessarily mean the overall nature of management is the same in both companies.  Christopher Dorn is the owner and President of Dorn Fire Protection, but the evidence does not support a finding that he played a managerial role at Dorn Sprinkler.  Similarly the evidence shows that David Dorn managed Dorn Sprinkler, but now he has a separate company, D & D Design, which has been hired by Dorn Fire Protection as well as several other companies.  The evidence further shows that Amy O'Shaughnessy did not manage either company, that she also has her own fire inspection business now, and that she serves as Dorn Fire Protection's bookkeeper in exchange for the use of office space.  None of these situations make the management of these two companies substantially identical.  *Compare Kenmore Contracting Co.* [*v. Int'l Assoc. of Bridge, Structural, & Orn. Iron Workers*], 289 NLRB No. 56, 1988 WL 213821, at *2 (finding substantially identical management where child capitalized new business only by virtue of funds from parents who owned original company).

*Dorn Sprinkler*, 669 F.3d at 795.  Here, the undisputed facts similarly show that the companies did not have substantially identical management.  It is undisputed that Tom

---

[18] SP notes that it performs more commercial and remodeling work and less residential work than R&T.  (Doc. 29, Ex. 6 at 51).  Even when the facts are construed in the light most favorable to SP, the record reflects that SP has merely increased the percentage of commercial and remodeling plumbing work it performs as compared to R&T.  It is undisputed that R&T previously performed commercial and remodeling same work and that SP continues to perform some residential work.  For example, Todd and Casey testified that Todd was always assigned the commercial projects with R&T.  (*Id.*, Ex. 5 at 10-11, Ex. 6 at 22).  Moreover, SP describes itself as performing "residential and commercial plumbing services" and SP's customer list reflects a substantial number of individual customers with inexpensive bills, which is consistent with the performance of residential work.  (*Id.*, Ex. 14 at ¶ 9, Ex. 17).

was the sole manager of R&T prior to December 2012 and that Todd manages SP.  (Doc.

29, Ex. 3 at 15-16, Ex. 5 at 36).  Plaintiffs repeatedly assert that R&T's management

structure between December 2012 and June 2013 is identical to SP's, but the cited

deposition testimony does not support these assertions.[19]  Todd testified that work was

assigned on an ad hoc or collaborative basis among the three plumbers during R&T's last

six months of operations:

---

[19] The testimony of Tom and Janine reveal that they lacked personal knowledge of how R&T's work was assigned among the plumbers between December 2012 and June 2013.  This is particularly so in light of the testimony from Todd and Casey.  Tom's deposition presented the following exchange:

| | | |
|---|---|---|
| Q: | And do you know who took over the day-to-day operations? |
| A: | Janine. |
| Q: | So she was assigning people to jobs? |
| A: | I believe so. |
| Q: | Do you know if your sons were involved in assigning people to jobs? |
| A: | They were the plumbers there.  I'm sure they broke them up. |

(Doc. 29, Ex. 3 at 29-30).

Similarly, Janine did not know specifics:

| | | |
|---|---|---|
| Q: | So Todd and Casey had a role, or they at least were involved with deciding who was going to be— |
| A: | I don't know.  I wasn't at the shop, so I honestly don't know— |
| Q: | Okay. |
| A: | —how it was assigned. |
| . . . . | |
| Q: | So who was running the day-to-day operations beginning in January 2013? |
| A: | Well, it was basically business as usual.  I would take calls and give the information to Todd and Casey. |
| Q: | Okay.  So Todd and Casey now were in charge of assigning out the work; is that correct? |
| A: | I'm assuming, yes. |
| Q: | With Tom gone, you previously stated that that was his job, correct? |
| A: | Right. |
| Q: | So now Todd and Casey have taken over that job effective January 2013, correct? |
| A: | Yes. |

(*Id.*, Ex. 4 at 35, 67).

32

> Q:    And at that point, what changed in the shop?
> A:    A little bit of chaos.  The guy [Tom] had told us what to do.  We didn't have that anymore.
> Q:    So he was no longer involved?
> A:    No.
> Q:    So who would decide who was going to take what job?
> A:    Janine received the phone calls.
> Q:    Same as before, right?
> A:    Right.  Basically, as a group, we would kind of figure out where is everybody going to go.  There wasn't a lot, so it wasn't like it was a real demanding we've got to schedule this.  It was this is what we've got for the day, let's do this.  I wouldn't say there was anybody in charge.
> Q:    So Tom's no longer involved, and you, your brother [Casey] and Scott are deciding what jobs you are going to do, correct?
> A:    Right.

(*Id.*, Ex. 5 at 17-18).  Casey similarly testified that in Tom's absence the three plumbers at R&T assigned the work among themselves based primarily on the type of project.  (*Id.*, Ex. 6 at 21-22).  When SP began operations, Todd testified that "I am the boss" and "I give everybody their jobs, what they need to do, what needs to be completed for that day."  (*Id.*, Ex. 5 at 36).  Additionally, Todd has shifted from working only in the field as a plumber to primarily working in the office and visiting sites to bid on jobs.  (*Id.* at 36-38, Ex. 6 at 45, 57-58).  Accordingly, the management factor weighs against alter ego status.

The undisputed facts show significant overlap in the operations of R&T and SP. First, unlike the two companies in *Dorn Sprinkler* that operated as competitors from October 2006 to March 2007, R&T ceased operations on June 14 or 15, 2013 and SP began operations on June 16, 2013.  (Doc. 29, Ex. 4 at 70, Ex. 5 at 32).  Not only did SP begin operations immediately after R&T closed, but all six of R&T's remaining

employees immediately began working for SP. (*Id.*, Exs. 7, 12). Casey, Scott, Ryan, and Jon continued to perform the same work with SP that they did with R&T. (*Id.*, Ex. 4 at 78, Ex. 5 at 56, Ex. 6 at 40). Todd shifted to more of a supervisory role and began to spend more time in the office and visiting jobs to place bids, but he continued to perform some plumbing work in the field. (*Id.*, Ex. 5 at 36-38, Ex. 6 at 45, 57-58). With the exception of answering phone calls, Janine carried over all of her duties and exclusively handled all of SP's financials for the first three months it operated. (*Id.*, Ex. 4 at 75-76, Ex. 5 at 34-36). SP's only new employee was Alissa, whose duties during the first three months of operation were limited almost exclusively to answering phone calls. (*Id.*, Ex. 5 at 34). It was not until September 2013 that Alissa took over SP's financials from Janine. (*Id.* at 35-36). Nonetheless, Janine continued to maintain some level of involvement with SP's administrative and financial functions until November 2013. (*Id.*, Ex. 4 at 75-76). In *Dorn Sprinkler*, the court noted that "only two of the fourteen Dorn Fire Protection employees worked for Dorn Sprinkler at or around the time of its closing, showing no real continuity of work force." *Dorn Sprinkler*, 669 F.3d at 795. Here, the continuity of work force is very pronounced.

The record also reflects that there were very few practical changes in the transition from R&T to SP. SP immediately began operating out of the same garage that R&T used. (Doc. 29, Ex. 5 at 59-60). The record does indicate that SP executed a new lease sometime in June 2013, but R&T abandoned its tools and equipment without cleaning out or vacating the garage. (*Id.*, Ex. 3 at 27-28, Ex. 5 at 59-60). The employees simply left the garage as R&T employees on June 14, 2013 and returned to it as SP employees on

34

June 16, 2013.  SP also used the same office and mailing address as R&T from June 16, 2013 to August 20, 2013.  (*Id.*, Ex. 6 at 41-42, Ex. 14 at ¶ 11).  After August 20, 2013, SP obtained a P.O. box for its mailing address, moved the physical location of the office to Todd's house, and obtained new furniture.  (*Id.*, Ex. 6 at 41-42, Ex. 14 at ¶ 11).  This again contrasts with *Dorn Sprinkler*, where the new company "rented separate office space" from the very beginning.  *Dorn Sprinkler*, 669 F.3d at 795.

The only practical change in operations between R&T and SP was that Alissa replaced Janine as the employee responsible for answering telephone calls.  R&T's main telephone number was the personal phone number at Tom and Janine's house.  (Doc. 29, Ex. 4 at 16).  On June 15, 2013, Tom and Janine transferred that number to Alissa's cell phone, which then became SP's primary telephone number.  (*Id.* at 72-73, 99, Ex. 5 at 33).  Further, Tom occasionally received calls on his personal cell phone from former customers of R&T.  (*Id.*, Ex. 3 at 43).  Tom testified that for a short time he would direct those customers to call SP's number, the same number that R&T formerly used, without informing the customer that there was a new company.  (*Id.*)

Although the companies' legal names are distinct, R. and T. Schneider Plumbing Co. and Schneider Plumbing Co., the undisputed evidence reflects that R&T was doing business as "Schneider Plumbing" since the early 1990's.  (Doc. 29, Ex. 3 at 17-18, Ex. 4 at 18).  R&T identified itself as "Schneider Plumbing" on all of its invoices since the mid-1990s, in the ads it placed in the telephone book, in the name painted on the sides of its vans, on its employees' uniforms, and on Tom's business cards.  (*Id.*, Ex. 3 at 17-22,

37, Ex. 4 at 18, Ex. 8, Ex. 20). The undisputed fact that the two companies did business by the same name supports a finding of alter ego.

SP continued to use R&T's invoices to some extent until December 2013. (Doc. 29, Ex. 15). Plaintiffs produced an invoice dated December 4, 2013 for a job completed by Todd. (*Id.*) This invoice uses the name "Schneider Plumbing," includes Tom's name and license number, and lists the address as Tom and Janine's house, which was R&T's office and also SP's for two months. (*Id.*) A second invoice produced by Plaintiffs dated December 11, 2013 uses the name "Schneider Plumbing Company," includes Todd's license number, and lists SP's P.O. box as the address. (*Id.*, Ex. 16). At her deposition, Janine identified several additional R&T invoices that were completed by SP employees for jobs after June 2013. (*Id.*, Ex. 4 at 123-29). However, these invoices were not filed as part of the record. Plaintiffs' citations to evidence in the record reflects that SP used R&T's invoices on several occasions, but does not establish how frequently SP used those invoices. Accordingly, the Court affords this evidence minimal weight, but it does weigh in favor of finding alter ego status.

R&T and SP maintained separate financials and, with one exception, did not intermingle funds. The companies purchased a majority of their goods from the same two suppliers and maintained accounts with those companies. (Doc. 29, Ex. 4 at 20-22). However, it is also undisputed that Janine closed R&T's accounts and opened new accounts for SP. (*Id.* at 70-71). SP also signed new contracts with the telephone and utility companies, signed a new lease for the garage, obtained new liability insurance and a new tax identification number, and opened a new bank account. (*Id.* at 100, 131-34,

Ex. 5 at 57-58, 60).  It is undisputed that the bank account statements for R&T and SP reflect that R&T made two separate transfers of $5,500 to SP's bank account on June 6, 2013.  (*Id.*, Ex. 4 at 81-84, 91-93, Ex. 13, Ex. 18).  These were the first two deposits into SP's account.  (*Id.*, Ex. 13).  Janine equivocally testified that she may have incorrectly made one of the $5,500 transfers from R&T to SP and later corrected the error.  (*Id.*, Ex. 4 at 92-93).  Although SP did not produce evidence showing a corresponding withdrawal from SP's account, the Court must view Janine's testimony in the light most favorable to SP.  Accordingly, the undisputed evidence establishes that R&T transferred $5,500 to SP in June 2013.  (*Id.*, Exs. 13, 18).

Notwithstanding several differences in discrete aspects of the companies' operations, the undisputed evidence reflects substantial continuity of operations between R&T and SP.  Most notably are the almost identical work force and the immediate transition from R&T to SP without any practical changes.  Accordingly, the operations factor weighs strongly in favor of alter ego status.

The undisputed facts also show that SP obtained almost all of its equipment from R&T without paying any consideration over two years later.  In *Dorn Sprinkler*, the court noted:

> [C]ontrary to the Union's contention that Dorn Fire Protection purchased equipment from Dorn Sprinkler "in commencing operations," the tools in question were acquired after Dorn Sprinkler went out of business, so Dorn Fire Protection began operations with all of its own tools, and in fact only acquired a limited number of tools and three pickup trucks from Dorn Sprinkler.  Moreover, Dorn Sprinkler sold many tools to other contractors and not just to Dorn Fire Protection.  Accordingly, the overlap in equipment between the two companies was insubstantial.

*Dorn Sprinkler*, 669 F.3d at 795-96 (internal citations omitted).  Here, it is undisputed that all the tools SP has owned and used were obtained from R&T.  (Doc. 29, Ex. 3 at 27-28, Ex. 4 at 96-97, Ex. 5 at 26-27, 31-32, Ex. 6 at 35, Ex. 14 at ¶ 8).  It is also undisputed that R&T has not received any payment for the tools and that no payment has been contemplated.  (*Id.*, Ex. 3 at 28, Ex. 5 at 26-27).  In fact, Tom twice testified that he simply "left" R&T's tools at the garage for SP to begin using.  (*Id.*, Ex. 3 at 27-28).  Together with Tom's total absence from R&T's operations from December 2012 to its closing in June 2013, the evidence shows that R&T's equipment was inherited by SP, not purchased in an arm's-length transaction.  *See Kenmore*, 1988 WL 213821, at *2 (concluding that "the less than arm's-length dealings between Kenmore and Sloan in the course of the latter's founding" strongly supported a finding of later ego).[20]

SP also obtained three of its five vehicles and its only trailer from R&T without exchanging any consideration to date.  (Doc. 29, Ex. 5 at 55, Ex. 14 at ¶ 8).  The logo and lettering that R&T placed on the vehicles remains unchanged now that SP owns and operates them.  (*Id.*, Ex. 6 at 57).  SP produced an unsigned document that it purports is an asset purchase agreement for the three vehicles and trailer.  (*Id.*, Ex. 9).  The asset purchase agreement lists the blue book value for the vehicles and trailer.  (*Id.*, Ex. 3 at 27, Ex. 4 at 95, Ex. 5 at 31).  Tom and Todd both testified that they expect SP to pay for the vehicles.  (*Id.*, Ex. 3 at 36, Ex. 5 at 30-31).  However, it is undisputed that SP has not

---

[20] SP cites the asset purchase agreement in support of its contention that SP will pay R&T for the tools.  (Ex. 9).  However, the asset purchase agreement only refers to the three vehicles and one trailer.  (*Id.*)  The cited deposition testimony similarly discusses payments for the vehicles with no mention of the tools or equipment.

made any payments after two years of exclusive use of those vehicles.  (*Id.*, Ex. 3 at 27-28, Ex. 5 at 55).  The undisputed evidence also reflects that title to those vehicles remained in R&T's name for several months after SP began using the vehicles.  SP obtained title to two of the vehicles from R&T on August 29, 2013.  (*Id.*, Ex. 10).  The title to the third vehicle was transferred on November 8, 2013.  (*Id.*)  Accordingly, the undisputed evidence reflects that SP began its operations using vehicles titled to R&T and has yet to pay any consideration for those vehicles.  The only new equipment that SP has independently purchased is office equipment after the office moved to Todd's house on August 20, 2013.  (*Id.*, Ex. 6 at 42).  The undisputed fact that the majority of SP's equipment was obtained from R&T and that no payments have been made over two years later weighs heavily in favor of finding that SP is the alter ego of R&T.

The next factor is the customer base.  In *Dorn Sprinkler*, nine of the new company's 250 customers were former customers of the original company.  *Dorn Sprinkler*, 669 F.3d at 796.  The court remarked that "proportionally speaking" this evidence was "simply not persuasive."  *Id.*  Here, sixty-seven of SP's 212 customers were former customers of R&T.  (Doc. 29, Ex. 4 at 103-122, Ex. 17).  Proportionally, SP's 31.6% overlap in customers is markedly more than the 3.6% overlap in *Dorn Sprinkler*. Several undisputed facts do militate against alter ego, including that SP did not complete any of R&T's unfinished jobs and SP did not collect money for work performed by R&T. Nonetheless, the extent of the overlap in customers supports a finding that SP is a disguised continuance of R&T.

Finding evidence of intent to avoid the effect of the CBA would require drawing an inference from the timing of Todd and Casey's meeting with the Union representative and their decision to open SP as a non-union company in April 2013.  The Court cannot draw such an inference on summary judgment.  However, intent to evade "is *not* essential to the imposition of alter ego status."  *Indus. Contracting, LLC*, 581 F.3d at 319 (6th Cir. 2009).

The business purpose, operations, equipment, and customer factors weigh in favor of concluding that SP is the alter ego of R&T; whereas the ownership, management, and supervision factors weigh against such a determination.  The Court is cognizant that "[t]he analysis is flexible and no one element should become a prerequisite to imposition of alter-ego status; rather, all the relevant factors must be considered together."  *Dorn Sprinkler*, 669 F.3d at 794.  Considering all the factors together, including the weight of the evidence presented with respect to each factor, the Court concludes that Plaintiffs have established that SP is the alter ego of R&T.  The undisputed evidence demonstrates that operations, equipment, and work force of R&T and SP were almost identical. Notwithstanding some minor changes, SP and R&T were almost indistinguishable. Accordingly, the Court concludes that SP is the alter ego of R&T and was bound by the CBA effective June 16, 2013.

### D.    Termination of the CBA

The conclusion that SP was bound by the CBA as the alter ego of R&T does not end the Court's analysis.  The CBA provides that it "shall remain in full force from September 1, 2011, to May 31, 2014, and shall automatically be renewed from year to

year thereafter, unless 60 days prior to the expiration of said Agreement or any renewal

thereof, either party may give notice of its intent to modify or terminate said Agreement."

(Ex. 2 at Art. XVII, § 18).

On March 27, 2014, SP sent a letter to the Union that stated in relevant part as

follows:

> To the extent that a court ever determines that Schneider Plumbing is bound
> by any collective bargaining agreement or otherwise has any obligation to
> the Union, Schneider Plumbing hereby withdraws from the MCA and
> terminates any collective bargaining agreement with the Union.  Please
> consider this correspondence to be Schneider Plumbing Co.'s sixty day
> written notice, pursuant to Article XVII, that it intends to terminate any
> collective bargaining agreement with or other obligation to the Union.
> Accordingly, the collective bargaining agreement shall not renew upon its
> expiration on May 31, 2014.

(Doc. 27, Ex. 5-4).  There is no dispute that this letter complied with the requirements of

the CBA.  Accordingly, SP properly terminated the CBA effective May 31, 2014.

## V.    CONCLUSION

Wherefore, for these reasons, Plaintiffs' Motion for Summary Judgment (Doc. 26)

is **GRANTED** and Defendant Schneider Plumbing Co.'s Motion for Summary Judgment

(Doc. 27) is **DENIED**.  Schneider Plumbing Co. shall produce all documents necessary

for Plaintiffs to complete a payroll compliance audit forthwith.  The parties shall submit a

joint proposed briefing schedule on the issue of damages to Chambers

(black_chambers@ohsd.uscourts.gov) within twenty-one days of the entry date of this

Order.

**IT IS SO ORDERED**.

Date:  7/10/2015                          _____s/ Timothy S. Black_____
                                          Timothy S. Black
                                          United States District Judge